**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Xavier V. PADILLA, Maria Jesus Padilla,**
**aka Suzy, Jorge Padilla, Donald Lake**
**Simpson, Warren Strubbe, Maria Sylvia**
**Simpson, Defendants–Appellees.**

**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Xavier V. PADILLA, Defendant–**
**Appellee.**

**Nos. 90–10311, 90–10316.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 19, 1991.

Decided April 1, 1992.

David A. Kern, Asst. U.S. Atty., Tucson, Ariz., for plaintiff-appellant.

Walter B. Nash, Tucson, Ariz., Steven M. Dichter, Harrison, Harper, Christian & Dichter, Phoenix, Ariz., Michael Bloom, Michael Piccaretta, Davis & Piccaretta, William Walker, Stompoly & Stroud, Michael Brady, Tucson, Ariz., for defendants-appellees.

Before: CHOY, ALARCON and T.G. NELSON, Circuit Judges.

T.G. NELSON, Circuit Judge:

The United States appeals an order of the district court holding that the defendants had standing to bring a motion to suppress, that there was no reasonable suspicion for the stop of a vehicle, and that the doctrines of attenuation and independent

source are not applicable to this case. We affirm as to three of the defendants, remand for further proceedings for two others and reverse as to the last.

## I. FACTS

On September 26, 1989, an Arizona trooper, Officer Russell Fifer, observed a 1976 Cadillac traveling westbound on the interstate. The officer noted that the vehicle appeared to be traveling slightly in excess of the speed limit (65 m.p.h.), although he admitted that the vehicle's speed was not excessive and that he would not have pulled over the vehicle for that speed.

At the suppression hearing, Fifer testified that the driver acted suspiciously. Upon noticing the officer, the driver jerked his head and stiffened. He passed the patrol vehicle and continued to view him through the side view mirror.

Fifer followed the vehicle for approximately eleven miles and testified that during this time the vehicle slowed down, traveling speeds that varied from 50 to 60 miles per hour. The officer radioed in the license plate number of the vehicle and was initially informed that the license plates belonged to a Pontiac, not a Cadillac. There was confusion regarding the plates but ultimately it was determined at the scene that the plates were, in fact, correct. Fifer testified, however, that the basis for his decision to stop the vehicle was not the possibility of the fictitious plate. Rather, he stopped the vehicle for driving at a speed he decided was too slow.

The officer testified that he believed he could stop a vehicle for driving at a slow speed if he believed the speed was not "reasonable and prudent." Fifer testified that he routinely issued both citations and warnings to travelers driving significantly slower than the posted limit. The defense introduced evidence that there is no posted minimum speed limit on the stretch of interstate where the vehicle was stopped.

Having pulled over the Cadillac, the officer questioned the driver, Luis Arciniega. Arciniega produced a valid driver's license and proof of insurance demonstrating that a customs official, defendant Donald Simpson, owned the Cadillac.

Another Department of Public Safety (DPS) officer, Robert Williamson, appeared on the scene. Both officers believed that Arciniega matched a drug courier profile. Accordingly, they requested and received Arciniega's consent to inspect the vehicle whereupon they discovered 560 pounds of cocaine concealed in the trunk.

The timing between the actual arrest and the resolution of the license plate mix-up is close. Fifer testified that the problem with the plates had been cleared up by 11:46 a.m. and that the arrest occurred at 11:50 a.m. Williamson's testimony confirms that the search of the trunk was not conducted until after the officers had learned of the license plate error.

Following the search, a third officer, Vanderpoole, was dispatched to the scene. Vanderpoole informed Arciniega that "[h]e was looking at at least twenty five years in prison; and since he was 50, he might not make it out of prison." Vanderpoole assured Arciniega that if he assisted the police, however, they would not file charges against him with the county attorney. Not surprisingly, Arciniega promptly agreed to cooperate. After a brief interrogation, it became apparent that Arciniega was merely a courier or "mule," carrying the load for other yet unidentified conspirators and the officers set out to apprehend Arciniega's "employers." DPS took Arciniega, the vehicle, and a portion of the cocaine to the Regal 8 Motel in Tempe where he was instructed to telephone his contact. He called what turned out to be the home of Alicia Padilla Romero, the sister of defendants Jorge and Xavier Padilla.

He spoke with apparent familiarity to an individual identified only as "Pollo" who promised to dispatch a runner to retrieve the load at the motel. Jorge Padilla and Maria Jesus "Suzy" Padilla, arrived at the motel in a white sedan. Jorge attempted to start the Cadillac while Maria began pulling the sedan out of the parking lot. DPS surrounded both vehicles and both defendants were immediately arrested. The officers found a rental contract in the white

sedan bearing the name of Xavier Padilla, the brother of Jorge and husband of Maria.

Following a lead from Maria, the investigators proceeded to Alicia Padilla Romero's house. While they were questioning Alicia, Xavier Padilla entered the residence. He indicated under questioning that he had been staying with Alicia only temporarily and did not directly implicate himself. The officers did not arrest Xavier at that time and in fact did not do so until January of the following year.

The following day, however, DPS informed the U.S. Customs Service that Customs Inspector Simpson's automobile was involved in a drug seizure. Customs agents and DPS investigators interrogated Luis Arciniega who further implicated Simpson. As a direct result of Arciniega's statements, a search warrant was issued on Simpson's home which resulted in the recovery of incriminating evidence implicating both Simpson and his wife, defendant Maria Sylvia Simpson.

On October 6, 1989, agents from the Customs Department, DEA and the Arizona Department of Public Safety all met with government counsel and agreed to cooperate and exchange information. This meeting is documented in an internal memorandum from the Customs Service and confirms that DPS information had been incorporated into all federal investigations which were commenced after the drug seizure.

Meanwhile, on October 12, 1989, in an apparently unrelated incident, Guillermo Owen was arrested in Sierra Vista, Arizona, for possessing a small amount of cocaine and paraphernalia. In an attempt to cut a deal, Owen offered what he knew about Arciniega's arrest a few weeks earlier. Owen discussed at length his involvement with Luis Arciniega, Arciniega's son Frank, defendant Warren Strubbe and various other players. From the DEA report

evidencing the interrogation, it appears that he did not, however, provide information regarding Mrs. Simpson, Jorge or Maria Padilla. Furthermore, the report only makes two brief references to Xavier and one to an unidentified customs official, presumably, Donald Simpson.[1]

Owen stated that he helped Strubbe and the Arciniegas unload about half of a large but unspecified amount of cocaine from a white and red Cadillac into Strubbe's Tucson apartment. A short time later, Arciniega departed with the remaining cocaine still in the Cadillac. Owen stated that he, Frank Arciniega and Strubbe delivered the cocaine from Strubbe's apartment to a storage facility rented by a Troy Barlous. After interrogating Owen and obtaining additional information, the DEA agents were issued a search warrant for the storage unit and uncovered 440 pounds of cocaine.

After a thorough reading of the record which includes reports from Customs, DEA, and the Arizona Department of Public Safety, an overall picture emerges. Xavier Padilla and the Simpsons were not drug merchants but were in the business of transporting contraband across the border for those that were. The seized cocaine was apparently owned by a cartel known as the "El Tejano" organization. Both Xavier Padilla and Sylvia Simpson had previously met with these people in Mexico and had successfully delivered three other loads. Jorge and Maria Padilla were possibly mere "employees" of the conspiracy and were under the direct supervision of Xavier.

Warren Strubbe was not a member of the transportation conspiracy responsible for the load seized from the illegal stop. According to Owen, Strubbe came in contact with the seized cocaine but did so only briefly. Instead, he participated in a separate conspiracy involving a separate load. While apparently the cocaine was initially

---

**1.** The references in the DEA Report of Investigation dated October 17, 1989, are as follows: (1) "OWEN stated Frank [Arciniega] received a telephone call and informed OWEN that it was from Javier PADILLA in California who informed him that Louis had been arrested with the load of cocaine and had fingered him. (2)

"OWEN stated that on 10–14–89, he was in the exercise yard with Louis Arciniega. OWEN stated that Louis told him that if Javier (PADILLA) did not take care of him and his family, he (Louis) would tell about the Customs guy that was involved with him."

combined, it had been divided and Strubbe's share parted ways with the confiscated load before the stop of Arciniega. Strubbe's connection with the seized load ended at the point of division.

## II. PROCEEDINGS BELOW

■ The district court determined that there was no founded suspicion for the stop of the vehicle. The government does not appeal this issue nor will we address it. The government does appeal, however, the district court's conclusion that all of the defendants had standing to contest the illegal stop and seizure of the cocaine found in the Cadillac even though none was present at the stop and only the Simpsons owned the vehicle. The court ruled that because they all exhibited sufficient control and supervision over the contraband, they could claim a legitimate expectation of privacy in the vehicle searched and the contraband seized.[2] The district court said:

> I think it is clearly a joint venture and even though it is a joint venture for transportation, as distinguished from ownership, it was a joint venture that had control of the contraband.

The court further found that the stop "clearly led to the subsequent activities of the day when the car was delivered to Tempe; that without that stop, there would not have been any involvement by the DPS, nor would they have informed Customs and DEA about that." The government now appeals the suppression of the seized evidence. We affirm the district court's suppression with respect to Xavier Padilla and Donald and Sylvia Simpson, but we have insufficient facts before us to determine whether Jorge and Maria Padilla had a legitimate expectation of privacy and remand for additional findings of facts regarding them. We further hold that Warren Strubbe has not demonstrated sufficient standing and reverse the district

court's decision as to his claim. Because we reach differing conclusions as to the various defendants, their positions will be discussed separately.

## III. DISCUSSION

### STANDING

#### Standard of Review

■ Mixed questions of law and fact are generally reviewed *de novo* although the clearly erroneous standard applies if the necessary analysis is primarily factual in nature. *United States v. McConney*, 728 F.2d 1195, 1202–1203 (9th Cir.1984) (en banc). Issues of standing are generally reviewed *de novo. United States v. Kovac*, 795 F.2d 1509, 1510 (9th Cir.1986), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 951, 93 L.Ed.2d 1000 (1987). The district court's factual findings on the issue of standing must be accepted unless clearly erroneous. *United States v. Broadhurst*, 805 F.2d 849, 851 (9th Cir.1986).

#### 1. The Simpsons and Xavier Padilla

■ As we will explain, the Simpsons and Xavier Padilla have established a legitimate expectation of privacy. The government challenges their standing because none of the defendants was present at the time of the arrest nor exhibited physical control of the vehicle or contraband. The Simpsons base their standing not only on their ownership of the car but also because they engaged in an organized effort to transport the contraband. Xavier Padilla argues that his ultimate responsibility for the load and the facts resulting from that role confer standing.

■ To contest the legality of a search and seizure, the defendants must establish that they had a "legitimate expectation of privacy" in the place searched or the property seized. *Rakas v. Illinois*, 439 U.S.

---

**2.** The term "standing" is used when discussing who may assert a particular Fourth Amendment claim. "Fourth amendment standing is quite different, however, from the 'case or controversy' determinations of Article III. Rather it is a matter of substantive fourth amendment law; to say that a party lacks fourth amendment

standing is to say that *his* reasonable expectations of privacy have not been infringed." *United States v. Taketa*, 923 F.2d 665, 669 (9th Cir. 1991) (citing *Rakas v. Illinois*, 439 U.S. 128, 139–140, 99 S.Ct. 421, 428–29, 58 L.Ed.2d 387 (1978)).

128, 143–44, 99 S.Ct. 421, 430–31, 58 L.Ed.2d 387 (1978). "Neither ownership nor presence are required to assert a reasonable expectation of privacy under the Fourth Amendment." *United States v. Johns*, 851 F.2d 1131, 1136 (9th Cir.1988); *United States v. Perez*, 689 F.2d 1336, 1338 (9th Cir.1982) (per curiam). Instead, we have consistently held that a coconspirator's participation in an operation or arrangement that indicates joint control and supervision of the place searched establishes standing. *United States v. Davis*, 932 F.2d 752 (9th Cir.1991); *United States v. Quinn*, 751 F.2d 980 (9th Cir.1984) (per curiam), *cert. dismissed*, 475 U.S. 791, 106 S.Ct. 1623, 89 L.Ed.2d 803 (1986); *United States v. Pollock*, 726 F.2d 1456 (9th Cir. 1984).

In ruling that the all defendants had standing, the district court determined that they were clearly participants in a joint venture. The defendants were "involved in the joint control over a very sophisticated operation involving ownership in Mexico or Colombia, [and] transportation aspects of the business [were] controlled by these people, and I think under those circumstances they have standing." With respect to these three defendants, we agree. Not only was there a formal arrangement for the transportation, the defendants shifted responsibility for the contraband between each other at various stages of the relay.

Our case law "is far from clear on the question of what a formal arrangement for joint control actually means.... We engage in a fact-specific analysis that includes consideration of the degree of cooperation and the respective possessory interests asserted." *United States v. Taketa*, 923 F.2d 665, 671 (9th Cir.1991). In so doing, we examine the totality of the circumstances to determine if the defendant's legitimate expectations of privacy were violated. *Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *United States v. Kovac*, 795 F.2d 1509, 1510 (9th Cir.1986), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 951, 93 L.Ed.2d 1000 (1987).

For example, in *United States v. Johns*, 707 F.2d 1093 (9th Cir.1983), *rev'd on other grounds*, 469 U.S. 478, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985), two pilots who had already off-loaded the contraband enjoyed standing to contest the search of a truck and seizure of the marijuana. Their standing was based on the fact that they "shared a bailor/bailee relationship" with the defendants who had possession of the drugs and were present during the search. *Id.* at 1099–1100. The pilots owned the marijuana but never argued that they owned nor controlled the vehicle that was searched. It was their formalized arrangement and possessory interest in the drugs which gave them a legitimate expectation of privacy. *See, e.g., United States v. Quinn*, 751 F.2d 980, 981 (9th Cir.1984) (absent defendant had standing to contest search because he owned the boat searched and had a possessory interest in the marijuana seized); *United States v. Pollock*, 726 F.2d 1456, 1465 (9th Cir.1984) (defendant exercised "joint control" over drug laboratory in his friend's house); *United States v. Perez*, 689 F.2d 1336, 1337–38 (9th Cir.1982) (per curiam) (defendants who accompanied vehicle could contest seizure of drugs from truck driven by coconspirator); *United States v. Davis*, 932 F.2d 752, 757 (9th Cir.1991) (defendant who had key to another's apartment, could come and go as he pleased, and stored items in a locked safe for privacy held to have standing); *United States v. Robertson*, 606 F.2d 853, 858 n. 2 (9th Cir.1979) (overnight guest had standing to assert Fourth Amendment violation in search of his possessions).

In fact, "[i]n virtually every case applying the coconspirator exception, the party granted standing to contest the search of another's property himself had an ownership interest in seized or searched property." *United States v. Taketa*, 923 F.2d 665, 671 (9th Cir.1991). In *Taketa*, the court rejected the defendant's standing argument because he asserted no ownership interest in the items seized. We recognize that the defendants here did not *own* the contraband in the strict sense that the *Johns* defendants did. Nevertheless, they held a possessory interest in the same

sense that the proprietors of a delivery service would possess a package.

Accordingly, the Simpsons and Xavier Padilla had standing not simply because the Simpsons owned the car and jointly possessed the drugs with Xavier but also because they participated in the organization, particularly on the day of the stop. Simpson, himself, was directly involved in the scheme. Obviously, his greatest asset to the conspiracy was his status as a customs official and his ownership of the car which avoided a search of his vehicle at the border. This, combined with evidence found at his home and the telephone records linking his customs station to the Padilla home and to a number in Agua Prieta, Mexico, supports the district court's finding that he had a coordinating and supervisory role in the operation. He was a critical player in the transportation scheme who was essential in getting the drugs across the border. Simpson established standing.

■ His wife, Maria Sylvia Simpson, arranged for the pickup of the drugs in Mexico and travelled across the border, keeping contact with the load.[3] It appears that she provided a communication link between her husband, Xavier Padilla, and the El Tejano people.[4] She held a supervisory role tying everyone together and overseeing the entire operation at least from the Mexico end. To continue with the delivery service analogy, she was the manager of the pickup point. Consequently, she also has established an expectation of privacy.

Xavier Padilla, for his part, exhibited substantial control and oversight with respect to the purchase in Mexico and primarily, the transportation through Arizona. DEA Agent Plover testified to the Grand Jury that he believed that Xavier Padilla probably had ultimate responsibility for the contraband on the day of the stop. Xavier indicated to the agent that it was he who was on the other end of the line when Arciniega called from the motel to make arrangements for pickup. Furthermore, he was participating in the negotiations with Mrs. Simpson and Oscar Monge in Agua Prieta. He had a possessory interest in the drugs equal to that of Mrs. Simpson and exhibited an equal degree of responsibility. It is inconsequential that he was not present at the stop nor that he was unable to exclude others from inspecting the vehicle. See Johns, 707 F.2d at 1100; Perez, 689 F.2d at 1338. Finally, as the man in charge, he sent his wife and brother to retrieve the load and was the principal contact with the "client," reflecting an overall responsibility to receive the drugs.

The complex relationships among these three defendants demonstrate that they were engaged in a sophisticated operation. Joint control can be established where the defendants were actively involved in a formal arrangement for transportation. Quinn, 751 F.2d at 981. The fact that the defendants in this case insulated themselves from the mule, Arciniega, is an example of their sophistication. Previously, we have considered efforts to avoid detection as one more factor demonstrating a reasonable expectation of privacy. See Pollock, 726 F.2d at 1465 (defendant's participation in relocating methamphetamine lab to avoid detection demonstrated expectation of privacy). We hold, therefore, that because Xavier Padilla and Donald and Maria Simpson have demonstrated joint control and supervision over the drugs and vehicle and engaged in an active partic-

---

3. Neither Simpson can establish standing solely by the conduct of his or her spouse. See Kovac, 795 F.2d at 1511 (a defendant could not assert standing by claiming he had a right to exclude others from access to his wife). They need not claim such an interest, however. Both exercised independent ownership of the vehicle and supervision or control over the drugs or participation in the operation. Moreover, their joint participation in the venture is one more factor contributing to the totality of the circumstances. See Id. at 1510, 11.

4. In his statement to the DEA, Xavier Padilla described the final meeting between himself, Sylvia and Oscar Monge, the contact with "El Tejano" who has sometimes been individually been referred by that name. In this meeting, Sylvia complained to Monge that she had not been paid for the previous three loads that she had "crossed" from Agua Prieta to Douglas, Arizona. Monge assured Sylvia that he would pay her for all deliveries after she had crossed the fourth and final load. At that point, Sylvia acquiesced and agreed to deliver the last load.

ipation in a formalized business arrangement, they have standing to claim a legitimate expectation of privacy in the property searched and the items seized.

### 2. Jorge and Maria Padilla

■ Jorge and Maria Padilla argue that they are entitled to standing primarily because they were active members of a formalized business arrangement on the day they attempted to retrieve the cocaine. It is evident that they were surrogates of the organization intending to retrieve the cocaine for their apparent superiors. They did not control the drugs yet they were an integral part of the formalized business arrangement that did. *See United States v. Broadhurst*, 805 F.2d 849, 851–52 (9th Cir.1986) (codefendants distributed responsibilities for marijuana cultivation and processing scheme, evidencing formalized business arrangement). It is not clear from the record, however, if they shared any responsibility for the enterprise. Xavier told the DEA that Jorge and Maria were following his orders when they arrived at the Regal 8 Motel. They intended to become the subsequent leg in the transportation scheme and would have held much the same bailee status as Luis Arciniega, only closer by blood and proximity to the boss. This, in and of itself, is not enough to confer standing. *See United States v. Aikins*, 946 F.2d 608, 613 (9th Cir.1990) (crew member had no standing to challenge search of vessel). On one end of the spectrum we have Luis Arciniega, a pawn working for a wage, on the other end we have the Simpsons and Xavier Padilla who were running the show. Jorge and Maria fall somewhere within these extremes but as the record now stands, we cannot determine where.

Xavier acknowledged in his statement to the DEA that Jorge and Maria knew what they were doing when they went to the motel. This does not necessarily evidence responsibility in the joint venture, however. Additionally, while their familial relationship with Xavier adds to the totality of the circumstances test by demonstrating their personal connection with Xavier, it does not confer standing by itself. *See Kovac*, 795

F.2d at 1511. On remand, we ask the district court to determine whether they were responsible partners of the venture or mere employees in a family operation.

### 3. Warren Strubbe

■ The above analysis discusses an ongoing relationship among defendants and a variety of actions on the day of the stop demonstrating active participation in a transportation scheme. By contrast, Strubbe was noticeably absent from the day's events and can only argue that he was a passive participant in the larger conspiracy. The mere involvement in a conspiracy does not, by itself, suffice. *United States v. Toliver*, 433 F.2d 867, 869 (9th Cir.1970), *cert. denied*, 401 U.S. 913, 91 S.Ct. 882, 27 L.Ed.2d 812 (1971). To hold that Strubbe had standing when he was only a participant in the larger criminal conspiracy, would be to create a "true coconspirator exception of general applicability." *Taketa*, 923 F.2d at 672. We concluded in *Taketa* that such an exception to *Rakas* which would provide standing for any person accused of criminal conspiracy would be in clear contravention of holdings of the Supreme Court and this circuit. *Id.* (citing *Alderman v. United States*, 394 U.S. 165, 172, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969); *United States v. Turner*, 528 F.2d 143, 164 (9th Cir.), *cert. denied*, 423 U.S. 996, 96 S.Ct. 426, 46 L.Ed.2d 371 (1975). Strubbe did not monitor the load, prepare to retrieve it, nor did he own the vehicle transporting it. In fact, he is part of a wholly separate illegal effort involving the cache in the storage unit. When Luis Arciniega drove away with the cocaine that was ultimately seized, Strubbe no longer had any control or apparent interest in the contraband or this conspiracy to deliver it. *See United States v. Mendia*, 731 F.2d 1412, 1414 (9th Cir.) (defendant abandoned expectation of privacy by turning heroin over to coconspirator and by not following when coconspirator drove away with the heroin in his trunk), *cert. denied*, 469 U.S. 1035, 105 S.Ct. 509, 83 L.Ed.2d 399 (1984).

His limited contact differs markedly from the others who aided transportation,

monitored the drugs or claimed possessory interests in the seized drugs, the vehicle, or both. *See Perez* 689 F.2d at 1338. Consequently, Strubbe cannot claim standing because he has demonstrated no active control or supervision over the drugs or the vehicle involved in this conspiracy.

## SUPPRESSION

■ Factual findings during a suppression hearing are accepted unless clearly erroneous. *United States v. Echegoyen,* 799 F.2d 1271, 1277 (9th Cir.1986). Whether evidence resulting from an illegal stop is sufficiently tainted to require suppression is a mixed question of law and fact that we review *de novo. United States v. Johns,* 891 F.2d 243, 244 (9th Cir.1989); *United States v. Limatoc,* 807 F.2d 792, 794 (9th Cir.1987).

■ The district court determined that the stop was unreasonable and that all subsequent information compiled that day would not have been discovered without it. The court based its ruling on *United States v. Johns,* 891 F.2d 243 (9th Cir.1989). In *Johns,* the court stated:

Our court has considered the question in terms of the substantiality of the taint. "[I]f the illegally obtained leads were so insubstantial that their role in the discovery of the evidence sought to be suppressed 'must be considered *de minimus,'* then suppression is inappropriate." ... In *Bacall,* the court emphasized that it was not using just a "but for" test, but was inquiring whether the illegally obtained evidence "tended significantly" to direct the investigation toward the evidence in question.

*Johns,* 891 F.2d at 245 (quoting *United States v. Bacall,* 443 F.2d 1050, 1056 (9th Cir.), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 565, 30 L.Ed.2d 557 (1971) (quoting *Durham v. United States,* 403 F.2d 190, 196 (9th Cir.1968) (internal citations omitted))).

Here, the impetus behind the DEA and Customs investigations was clearly the stop of Arciniega. The documents before the district court indicate that the reason for the investigation of Simpson was because his vehicle was apprehended in a drug seizure.[5] Two of the Padillas were arrested directly from the telephone call from the motel. Xavier Padilla was immediately implicated as a direct result of the seizure. The illegal stop was the sole reason for discovering the drugs and these defendants. The exploitation of the primary illegality could hardly be more direct. *See Johns,* 891 F.2d at 245. *See also United States v. Chamberlain,* 644 F.2d 1262, 1269 (9th Cir.1980), *cert. denied,* 453 U.S. 914, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981).

The Government argues, however, that Arciniega's cooperation separated his information from the illegal arrest. It is well settled that even "granting [the] establishment of the primary illegality," if the prosecution can demonstrate that the evidence was obtained independently, the primary taint has been purged. *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).

It was held in *United States v. Ceccolini,* 435 U.S. 268, 276, 98 S.Ct. 1054, 1059, 55 L.Ed.2d 268 (1978), that a living witness's testimony or information will not purge the taint when the testimony was not of the persons's free will. The Court cautioned, however, that before live witness testimony or, in this case, information, as opposed to tangible evidence, will be suppressed, a "closer, more direct link between the illegality and ... testimony is required." *Id.* at 278, 98 S.Ct. at 1061.

We find such a direct link here. First, we recognize the heavy weight upon a man's shoulders who has just been arrested with hundreds of pounds of drugs in the car he was driving. The significance of this pressure is critical not just for its emotional impact but because we previously have studied the amount of time that

5. The Report of Investigation prepared by the United States Customs Service indicates that Simpson was identified as a possible coconspirator only after a meeting with DPS following the seizure. Moreover, this memorandum, prepared October 18, 1989, substantiates that agents from Customs, DEA, DPS and the U.S. Attorney's office intended to integrate their efforts and based their investigation on the information supplied by DPS.

elapsed between the illegal search and the questioning. *United States v. Ramirez–Sandoval*, 872 F.2d 1392, 1397 (9th Cir. 1989). The discovery of the cocaine and the questioning of Arciniega were virtually simultaneous events.

Secondly, we are persuaded by the fact that the identities of the defendants would not have been known without the seizure and subsequent questioning of Arciniega. In *Ramirez–Sandoval*, we noted that "the identity of the witnesses and their relationship to the defendants were not known to the policemen and would not have been discovered in the absence of the illegal search." *Id.* at 1398 (citing *United States v. Rubalcava–Montoya*, 597 F.2d 140, 143–44 (9th Cir.1978) ("here there is no indication that the connection between the crime and the witnesses would have been discovered from a source independent of the illegal search") (citations omitted)).[6] Also, as in *Ramirez–Sandoval* and *Rubalcava–Montoya*, there is no indication that the informant would have come forward of his own accord. In fact, it would be ludicrous to suggest that he would. We stated in *Ramirez–Sandoval*, "[o]n the contrary, [the witnesses] had every incentive not to do so because they participated in the illegal activity." 872 F.2d at 1398.[7]

We conclude that Arciniega's cooperation was the direct result of his arrest and his position as a putative defendant. His "roadside deal" was too inextricably linked to the seizure and too closely related to the discovery of the defendants to purge the taint. Therefore, the district court properly suppressed all evidence seized based on the illegal stop against the Padillas and Simpsons.[8]

The Government argues that Guillermo Owen's statements should not have been suppressed and we agree. Although he only incriminated Xavier Padilla and Donald Simpson marginally, Owen was the kind of independent source that will be separated from the primary illegality. Over two weeks elapsed before he talked to the DEA about the illegal stop. He came forward independently to extricate himself from a wholly unrelated drug arrest. "Where police misconduct did not induce the witness' cooperation, the testimony will not be suppressed even though the unreasonable intrusion was one step in a series of events that led to the witness testifying." *United States v. Hooten*, 662 F.2d 628, 632 (9th Cir.1981), *cert. denied*, 455 U.S. 1004, 102 S.Ct. 1640, 71 L.Ed.2d 873 (1982). His statements are distinguishable from Xavier Padilla's because the latter was arrested as the result of the investigation which flowed from the illegal stop. In Padilla's case, the seizure played the critical role in his decision to cooperate with the DEA. *See United States v. Leonardi*, 623 F.2d 746, 752 (2d Cir.), *cert. denied*, 447 U.S. 928, 100 S.Ct. 3027, 65 L.Ed.2d 1123 (1980).

## IV. CONCLUSION

With respect to standing, we hold that the district court's factual findings pertaining to Donald Simpson, Maria Sylvia Simpson and Xavier Padilla were not clearly erroneous and that its applications of law were correct. We further hold that it properly suppressed evidence seized from the vehicle driven by Luis Arciniega or obtained directly because of the stop. We

---

**6.** See also *United States v. Scios*, 590 F.2d 956, 963 (D.C.Cir.1978) (en banc) (*Ceccolini* distinguished because the government only learned of the potential witness after illegally searching the defendant's files).

**7.** This court has never adopted a per se rule limiting *Ceccolini* to "good citizen" witnesses who testify "out of a sense of civic duty," nor do we do so now. *Ramirez–Sandoval* at 1398 (quoting *United States v. Hooton*, 662 F.2d 628, 633 (9th Cir.1981)), *cert. denied*, 455 U.S. 1004, 102 S.Ct. 1640, 71 L.Ed.2d 873 (1982). We still adhere to an analysis that looks to the incentive

behind a person's decision to come forward when discussing the attenuation determination.

**8.** The entire coordinated investigation was based solely on the illegal stop of Arciniega. Consequently, with the exception of Owen's statements which while derivative, came independently into the hands of the investigators, all evidence before the district court was properly suppressed. This includes evidence recovered in the Simpson home as well as the post-arrest statements made by Xavier Padilla and Luis Arciniega.

remand to the district court for further findings of fact as to Jorge and Maria Padilla because we are unable to determine their degree of responsibility. If it is ultimately determined that they had standing, the suppression analysis applies to them as well. Finally, we hold that the district court's finding that Warren Strubbe had standing was clearly erroneous. Consequently, we need not discuss the suppression issue with respect to him.

AFFIRMED in part, VACATED in part, and REMANDED.