70 F.3d 1275
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Wendell JUSTICE, Defendant-Appellant.
 No. 95-1429.
 United States Court of Appeals, Seventh Circuit.
 Argued Aug. 2, 1995.
Decided Dec. 1, 1995.
 
 Before BAUER, COFFEY and MANION, Circuit Judges.
 ORDER
 In May 1994, a federal grand jury indicted Wendell Justice for various drug related offenses, including conspiracy to distribute cocaine, in violation of 18 U.S.C. Sec. 846; use of a firearm during or in relation to a drug-trafficking offense, in violation of 18 U.S.C. Sec. 924(c); as well as money laundering, in violation of 18 U.S.C. Sec. 1956. Justice filed a pre-trial motion to suppress evidence implicating him in the unlawful acts. He then entered a conditional plea of guilty, reserving the right to appeal an adverse ruling on the suppression motion. Fed.R.Crim.P. 11(a)(2). The district court denied the motion and found him guilty based upon the evidence presented and his plea. Justice appeals. We affirm.
 
 I. Background
 
 1
 In November 1993, Indiana State Police suspected that drugs from out-of-state were being imported to the Indianapolis area through a Holiday Inn hotel in Indianapolis, Indiana. On November 9, Holiday Inn management provided a tip to the state police that a suspicious guest had checked in that evening. Trooper Dean Wildauer was sent to investigate.
 
 
 2
 Registering under the name Jose Armenta-Baeza with a Utah address, the suspicious guest had been accompanied by an unidentified male, who had driven away in a van. A check of the van's license plates revealed that it had been rented in Hobart, Indiana, to the defendant in this case, Wendell Justice. During Trooper Wildauer's investigation, the car rental company allegedly told him that the van was five days overdue and they were interested in its return. Trooper Wildauer placed a call to authorities in Utah and learned that someone named Jose Baeza was under investigation for illegal drug-dealing in that state. He also learned that the hotel guest, Baeza, had placed telephone calls from the hotel to the residence of Michelle Simmons, in Indianapolis.
 
 
 3
 The following day, state troopers located the van, parked outside the residence of Simmons. The troopers observed a man, who turned out to be Wendell Justice leave the Simmons residence, get in the van, and drive away; the troopers followed the vehicle. When the van stopped at a gas station, Trooper Jeffrey Sego approached the driver, asked him for identification and told him that the rental van was five days overdue and would have to be impounded. Trooper Sego then instructed the other trooper, Scott Stockton, to conduct an inventory of the van and its contents. Trooper Stockton proceeded and discovered a loaded handgun that Justice admitted was his and was unlicensed. The trooper also found a briefcase and briefly inspected its contents. Thereafter, the briefcase was temporarily misplaced by the troopers, until later discovered in a state police evidence locker. The troopers arrested Justice for the firearm violation and impounded the van, taking it to the state police post for an inventory search. The officers at the state police post summoned a drug-sniffing dog to search the van and upon sniffing, the animal reacted positively, indicating that it had located an odor of narcotics. Although no actual drugs were found, the dog's reaction indicated that illegal drugs had recently been present in the van. With this information, the state police obtained a warrant to search Armenta-Baeza's room at the Holiday Inn. There, they found an address book that contained the names of Jeffrey Alexander, Michelle Simmons and others, a handgun, rubber gloves, and a book on "Cocaine Wars." They also learned that Armenta-Baeza's true name was Javier B. Armenta.
 
 
 4
 As part of a separate investigation, on November 18, 1993, IRS Agent Daniel Neukam prepared to execute a warrant for the arrest of Jeffrey Alexander whom Agent Neukam suspected was laundering money from the sale of drugs in Indianapolis, Indiana. The federal investigation of Alexander had begun in December 1992 and was in no way related or dependent upon the state police surveillance at the Holiday Inn in Indianapolis. Agent Neukam testified at the suppression hearing that he was unaware of the November 10th search and arrest of Wendell Justice. To assist in the execution of the search warrants, Agent Neukam enlisted the support of uniformed Indiana state police officers, including Trooper Wildauer, the officer who had initiated the investigation at the Holiday Inn. Although Agent Neukam had been assigned to several drug investigations for years with the Indiana state police, both Neukam and Wildauer testified that they had never worked together prior to November 18. After a briefing to outline the nature of the operation and the description of the arrestee, Agent Neukam and the state police located Alexander, arrested him, and proceeded with him to his residence. At the residence, the police found two business cards: one for Javier Armenta's nightclub and the other for Wendell Justice's barbershop, both located in Salt Lake City, Utah.
 
 
 5
 Trooper Wildauer was assigned to transport Alexander from the point of his arrest to his residence and then to the federal building in Indianapolis. According to Trooper Wildauer, while in transport, Alexander made a number of statements concerning the police missing a big drug case last week and a person of Mexican descent residing at a Holiday Inn on the west side. Trooper Wildauer connected these statements to the November 10 state police investigation that resulted in Wendell Justice's arrest. However, according to Alexander, there was a sheet of paper on the seat of Wildauer's patrol car that had a number of names listed thereon, including Wendell Justice, Michelle Simmons, and Armenta-Baeza. Alexander testified that:
 
 
 6
 When they first arrested me and I seen the names, I was going inside the police car and we had a conversation about that, then at the time I was asking about what he was looking for, what he was doing with those names. And that's when he was saying that he was following up on to about some drug lead or something like that. And that's when he said the other agent had acted kind of quickly on it.... And that's when we struck the conversation up about the business cards they found in my house.
 
 
 7
 (Tr. II at 120). At the federal building, Alexander was questioned by both Agent Neukam and Trooper Wildauer and during the interrogation he revealed the existence of a large drug conspiracy that transported cocaine from Utah to Indianapolis where it was distributed and sold. Alexander testified that his motivation for cooperating was the following:
 
 
 8
 Well, I felt it was in my interest. I also knew that when things started happening inside this circle, that I could be brought into a conspiracy charge myself. So I mean I had numerous reasons for doing whatever I did.
 
 
 9
 (Tr. II at 130). Alexander referred to the names of Justice, Armenta-Baeza, Simmons, and others and described each person's role in the conspiracy.
 
 
 10
 In January 1994, three months after the search of Justice's van, the state police discovered Wendell Justice's misplaced briefcase in a state police evidence locker. After Trooper Wildauer inspected the briefcase and found that it contained an address book, travel records, and a hotel receipt, he immediately turned it over to his supervisor who gave it to IRS Agent Neukam.
 
 
 11
 Wendell Justice was arrested in February 1994 as a result of the November 10 search on federal charges of being a felon in possession of a firearm, in violation 18 U.S.C. Sec. 924(g) (Cause No. IP 94-41-CR). However, after an evidentiary hearing, Hon. S. Hugh Dillin ruled that the troopers had no reasonable grounds to initially seize the van on November 10, 1993, based only on the alleged request of the rental company. Because the initial seizure of the van was unreasonable, the troopers had no lawful basis to make a subsequent custodial search of the van. The district court granted Justice's motion to quash the indictment. By stipulation of the parties, that ruling is the law of the case.
 
 
 12
 Three months later, in May 1994, Justice was indicted for conspiracy to distribute cocaine in an amount in excess of five kilograms, in violation of 21 U.S.C. Sec. 846, money laundering, in violation of 18 U.S.C. Sec. 1956(a)(1)(A)(I), and possession of a firearm in relation to a drug trafficking offense, in violation of 18 U.S.C. Sec. 924(c). Justice filed a pre-trial motion to suppress the evidence implicating him in the conspiracy. In October 1994, Justice entered a conditional plea of guilty, reserving the right to appeal an adverse ruling by the district court on his suppression motion. After an evidentiary hearing, the district court denied Justice's motion to suppress, found him guilty and thereafter sentenced him to 210 months' imprisonment on each count, sentences to run concurrently, to be followed by a five-year term of supervised release to run concurrently with two three-year terms of supervised release. Justice appeals.
 
 II. Analysis
 
 13
 Jeffrey Alexander implicated Justice and several others in a drug conspiracy. Had Justice proceeded to trial, the Assistant United States Attorney advised Justice and the district court that he would have presented Alexander and the co-conspirators as witnesses against Justice. Asserting that the district court erred in denying his suppression motion, Justice contends that Alexander's statements and the potential testimony of the co-conspirators must be excluded because it arose directly as a result of the November 10, 1993, unreasonable search of Justice's van and is therefore 'fruit of the poisonous tree.'[1] The denial of a motion to suppress is reviewed for clear error. United States v. James, 40 F.3d 850, 874 (7th Cir.1994).
 
 
 14
 "The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion." Wong Sun v. United States, 371 U.S. 471, 485 (1963). "In addition to evidence obtained directly from a violation of the Fourth Amendment, the 'fruit' of such illegal conduct must be excluded." United States v. Wilson, 36 F.3d 1298, 1306 (5th Cir.1994). However, the Supreme Court has "declined to adopt a 'per se or but for' rule that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest." United States v. Ceccolini, 435 U.S. 268, 276 (1978) (citing Brown v. Illinois, 422 U.S. 590, 603 (1975)). Thus, "the exclusionary rule should not apply when the causal connection between illegal police conduct and the procurement of evidence is 'so attenuated as to dissipate the taint' of the illegal action." United States v. Fazio, 914 F.2d 950, 957 (7th Cir.1990) (emphasis added) (quoting Segura v. United States, 468 U.S. 796, 805 (1984) (quoting Nardone v. United States, 308 U.S. 338, 341 (1939)). "Attenuation analysis [is] appropriately concerned with the differences between live-witness testimony and inanimate evidence.... 'since the living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give.' " Ceccolini, 435 U.S. at 277, 278 (citation omitted). Further, "since the cost of excluding live-witness testimony often will be greater [than excluding documentary evidence], a closer, more direct link between the illegality and that kind of testimony is required." Id., at 278.
 
 
 15
 In Brown v. Illinois, 422 U.S. 590 (1975), the Supreme Court articulated several factors that guide the determination 'whether the taint of an unlawful search or arrest has sufficiently dissipated so as to no longer taint a subsequently acquired statement.' " Fazio, 914 F.2d at 957 (quoting United States v. Patino, 862 F.2d 128, 132 (7th Cir.1988)). "The threshold requirement in the attenuation analysis is the voluntariness of the challenged statement." Patino, 862 F.2d at 132. The statement must be " 'sufficiently an act of free will to purge the primary taint' of the Fourth Amendment violation." Fazio, 914 F.2d at 957 (quoting Brown, 422 U.S. at 602). The remaining factors bearing on admissibility are the 'temporal proximity' of the illegal conduct and the statements, the presence of any intervening circumstances, "and, particularly, the purpose and flagrancy of the official misconduct." Id.
 
 
 16
 As an initial matter, we are satisfied that Alexander's statements were voluntary. Trooper Wildauer made no threats, inducements, or promises to obtain Alexander's cooperation. See United States v. Baldwin, 60 F.3d 363, 365 (7th Cir.1995) ("the proper test [for voluntariness] is whether the interrogator resorted to tactics that in the circumstances prevented the suspect from making a rational decision whether to confess or otherwise inculpate himself."). Indeed, Alexander himself testified that he cooperated with the investigation to in an attempt to extricate himself from the conspiracy. See United States v. Padilla, 960 F.2d 854, 863 (9th Cir.1992) ("Where police misconduct did not induce the witness' cooperation, the testimony will not be suppressed even though the unreasonable intrusion was one step in a series of events that led to the witness testifying." (quoting United States v. Hooten, 662 F.2d 628, 632 (9th Cir.1981), cert. denied, 455 U.S. 1004 (1982)).
 
 
 17
 Turning to the factor of temporal proximity, we note that a full seven days had elapsed between the unlawful search of Justice's van and Alexander's statements. Further, Alexander was neither held in custody nor subject to interrogation during that one week period. The length of time between the search and the statements coupled with Alexander's freedom during the week differs markedly from the situations in which the Supreme Court has applied the exclusionary rule. See Taylor v. Alabama, 457 U.S. 687, 691 (1982) (confession that followed illegal arrest by six hours was not sufficiently attenuated where suspect remained in police custody, was unrepresented by counsel, had been questioned, fingerprinted, and subjected to a line-up); Brown, 422 U.S. at 604-05 (confession that followed illegal arrest by two hours was not sufficiently attenuated where no intervening event of any significance occurred between the time of the arrest and the confession).
 
 
 18
 Finally, a consideration of the "purpose and flagrancy of the official misconduct," Brown, 422 U.S. at 604, supports the conclusion that Alexander's statements were sufficiently attenuated from the search of Justice's van. Initially, the IRS investigation of Alexander was unconnected to state police surveillance of the Holiday Inn hotel and search of Justice's van. Further, IRS Agent Neukam testified that there were several independent sources of evidence supporting the warrant for the arrest of Alexander, including information from confidential informants and evidence that Alexander had recently purchased a night club with $80,000 in cash. Although Alexander observed a list of co-conspirator's names in Trooper Wildauer's vehicle, Trooper Wildauer testified that he had no connection to the investigation of Alexander, except to be called in on the morning of the arrest to assist the IRS agents. Although the record fails to explain the reason for the existence of the list of co-conspirators on the seat of Wildauer's vehicle, there is no indication that this fortuitous event was planned or that the knowledge gained from the prior unlawful search was exploited to elicit Alexander's statements. Indeed, Trooper Wildauer did not question Alexander, but listened to his statements until, in Wildauer's own words, "I started putting two and two together." (Tr. II at 100). See Ceccolini, 435 U.S. at 279 ("The evidence indicates overwhelmingly that the testimony given by the witness was an act of her own free will in no way coerced or even induced by official authority....").
 
 
 19
 We hold that the district court did not commit clear error in denying Justice's suppression motion because Alexander's statements were sufficiently attenuated from the illegal search of Justice's van.[2]
 
 III. Conclusion
 
 20
 We affirm the decision of the district court.
 
 
 
 [1]
 Although Justice contends that all of the statements and potential testimony of his co-conspirators should be held inadmissible, he presents no reason for their exclusion other than the circumstances surrounding the arrest and interrogation of Alexander. Our discussion, therefore, is limited to whether Alexander's statements should have been excluded by the district court
 
 
 [2]
 In addition to arguing that Alexander's statements were sufficiently attenuated from the illegal search of Justice's van, the government contends in the alternative that the statements were the product of an "independent source" and thus constitute an exception to the exclusionary rule. "In the classic independent source situation, information which is received through an illegal source is considered to be cleanly obtained when it [also] arrives through an independent source." Murray v. United States, 487 U.S. 534, 538-39 (quoting United States v. Silvestri, 787 F.2d 736, 739 (1986)). However, in Justice's case, Alexander's statements and the illegal state police search were not "independent": Alexander testified that he saw a list of co-conspirators' names on the seat of Wildauer's car and was motivated to cooperate, in part, by seeing them. Presumably, Wildauer had the list of names in his vehicle as a result of his recent investigation of Wendell Justice and the flow of drugs through the Holiday Inn in Indianapolis. However, because we hold that Alexander's statements were sufficiently attenuated from the illegal search, we see no reason to address the applicability or the merits of the government's alternative "independent source" argument