**UNITED STATES of America, Plaintiff,**

**v.**

**Dorian Lee DANIEL, Lester Wilson and Terhain Woods, Defendants.**

**No. CR–S–91–319–PMP (LRL).**

United States District Court, D. Nevada.

Sept. 28, 1992.

Bradford R. Jerbic, and Anthony S. Murry, Asst. U.S. Attys., Las Vegas, Nev., for U.S.

Franny A. Forsman, Federal Public Defender, Las Vegas, Nev., for defendant Dorian Lee Daniel.

Michael V. Stuhff, Las Vegas, Nev., for defendant Lester Wilson.

Theodore J. Manos, Las Vegas, Nev., for defendant Terhain Woods.

## ORDER

PRO, District Judge.

On May 18, 1992, Defendant Daniel filed a Motion to Suppress Statements and Evidence (# 322). On May 22, 1992, Defendants Wilson, Daniel and Woods filed a Motion to Suppress Evidence (# 361), which was supplemented on July 20, 1992 (# 513 and # 514). The Government filed a Consolidated Response thereto (# 389) on June 3, 1992, which was supplemented (# 522) on July 27, 1992. On September 9, 1992, the Honorable Lawrence R. Leavitt entered a Report and Recommendation (# 542) recommending the granting of Defendants' above-referenced Motions. No Objections were filed to the Magistrate Judge's Report and Recommendation in accordance with Local Rule 510-2 of the Rules of Practice of the United States District Court for the District of Nevada. On September 24, 1992, the Clerk of Court referred this matter to the undersigned for consideration.

The Court has conducted a *de novo* review of the record in this case in accordance with 28 U.S.C. § 636(b)(1)(B) and (C)

and Local Rule 510–2 and determines that the Report and Recommendation of the United States Magistrate Judge entered September 9, 1992, should be affirmed.

IT IS THEREFORE ORDERED that the Magistrate Judge's Report and Recommendation entered September 9, 1992 (# 542) is affirmed, and Defendant Daniel's Motion to Suppress Statements and Evidence (# 322) and Defendants Wilson, Daniel and Woods' Motion to Suppress Evidence (# 361) are granted.

## REPORT AND RECOMMENDATION

LEAVITT, United States Magistrate Judge.

The defendants are awaiting trial on a variety of drug-related charges. They have filed two suppression motions relating to a search and seizure which occurred on May 4, 1991. All three defendants jointly filed a Motion to Suppress Evidence (# 361, filed May 22, 1992). Defendant Daniel separately filed a Motion to Suppress Statements and Evidence (Arrest of May 4, 1991) (# 322, filed May 18, 1992). Collectively the defendants contend that the seizure of a Baretta handgun from the engine compartment of the automobile in which they were riding on May 4, 1991, and their arrest immediately thereafter, were the product of an unlawful detention. They seek an order suppressing the handgun and any statements they made to the police during the unlawful encounter.

## THE EVIDENCE

An evidentiary hearing was held on July 10 and 14, 1992. The government called as its only witness Officer Eric Kruse of the Las Vegas Metropolitan Police Department (Metro). Defendant Woods called three witnesses: Metro Officers Martin Wildman and Cindy Wells, and Sgt. Michael Dailey. The testimony revealed the following.

On May 4, 1991, four members of Metro's Selective Enforcement Detail (SED), riding in pairs,[1] were engaged in "gang suppression activity" in the vicinity of Carey and Ellis Streets in North Las Vegas, an area in which gang members are known to live.[2] At approximately 5:00 p.m., Dailey and Wells noticed a station wagon containing four young black men proceeding westbound on Carey. The officers pulled in behind the station wagon and began to follow it. The station wagon was being driven by defendant Terhain Woods and was registered to Woods' mother. In the front passenger seat was defendant Dorian Lee Daniel, whom the SED officers immediately recognized as the leader of a gang known as "Anybody's Murderers." In the rear seat were defendant Lester Wilson and another man.

As Dailey's car began to follow the station wagon westbound, Daniel turned and stared at the officers. Dailey radioed to Officer Kruse that he (Dailey) was about to stop the station wagon. A short distance up the street, Kruse turned a corner and began to proceed eastbound on Carey, towards the approaching cars. Suddenly Woods made a U-turn directly in Kruse's path, causing Kruse to jam on his brakes to avoid a collision. Kruse and Wildman promptly stopped Woods' car, ostensibly for the unsafe U-turn.[3] Daley and Wells

---

1. In one car were Sgt. Daley and Officer Wells. In the other car were Officers Kruse and Wildman. Their vehicles were unmarked, but they were wearing bright yellow shirts on which the word "police" was prominently displayed.

2. On cross-examination Officer Kruse described "gang suppression activity" this way:

    Q. What is gang suppression?
    A. You go out, and if gang members are out and about and committing crimes, then we go out and talk to them.
    Q. What if gang members are out and about and they're not committing crimes?
    A. Then sometimes we'll talk to them for gang intelligence information.

    Q. So you stopped—you were on the lookout for people that you think are gangs and you intend to stop them for that reason.
    A. We don't stop people that we think are gang members. We do stop people that are known gang members to see what their status is, and all these are nonhostile stops, sir.
    Transcript of July 10, 1992, pp. 99–100.

3. The officers testified that at the moment of the traffic stop they knew they had no probable cause to believe any of the defendants had committed or were committing a crime—other than the unsafe U-turn.

came around to back them up.[4]

With guns drawn, the officers ordered the defendants to keep their hands in plain view and step out of the car. As the four men got out of the station wagon, the officers recognized Woods and Wilson, and knew from previous encounters that they were gang members also. The men were ordered to raise their hands behind their heads, and were frisked for weapons. None was found. Kruse performed a cursory search of the passenger compartment of the wagon, and found no weapons. The defendants were then permitted to lower their hands. Kruse immediately asked Woods whether there were any guns or drugs in the car. When Woods said "No," Kruse asked whether he could take a look. Woods responded, "Go ahead." Kruse looked through the interior of the vehicle, then lifted the hood. In the engine compartment he found a Baretta handgun adjacent to the motor mounts.

As soon as the Baretta was found the defendants were ordered down on their knees. On his police radio Kruse requested a records check on the Baretta to determine whether it was stolen. While the police awaited word on the status of the Baretta, the defendants remained on their knees at the front of Kruse's car.[5] When Kruse was informed that the gun was stolen, he placed the defendants under arrest for possession of stolen property.

---

**4.** Sgt. Dailey was called as a defense witness. On direct examination he gave this testimony regarding the basis for his decision to stop the station wagon:

> Q. Would you have radioed to Kruse that you were about to stop the vehicle?
> A. Yes, probably.
> Q. What would your reason have been for stopping it if this was prior to the U-turn?
> A. I probably would have told them that I was about to stop it, still looking for some sort of probable cause, to insure that he was coming to back us up. So at the time that I radioed it, I may not have said, "This is my probable cause for stopping it." And I probably did say, "I'm about to stop this vehicle," having not developed the probable cause and stopped it yet, though.
> Q. Would you have stopped the vehicle without developing probable cause?
> A. Probably not, but I'm sure that I could have found something.

Transcript of July 14, 1992, p. 114.

## DISCUSSION

### 1. Standing

▓▓▓ The government does not question Woods' standing to challenge the search of the car.[6] Nor does the government contest Daniel's and Wilson's standing to challenge the stop of the car or their subsequent detention.[7] The government does, however, contest Daniel's and Wilson's standing to challenge the search of the car. Whether they have standing depends on whether the challenged search violated their personal Fourth Amendment rights. *Rakas v. Illinois*, 439 U.S. 128, 140, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978). That question in turn depends on whether Daniel and Wilson had "a legitimate expectation of privacy in the invaded place." *Id.* at 143, 99 S.Ct. at 430. *See also United States v. Salvucci*, 448 U.S. 83, 91–92, 100 S.Ct. 2547, 2552–53, 65 L.Ed.2d 619 (1980). Daniel and Wilson carry the burden of proof on this issue. *United States v. Nadler*, 698 F.2d 995, 998 (9th Cir.1983).

▓▓▓ Daniel and Wilson were passengers in a car in which they asserted neither a property nor a possessory interest. Nor did Daniel or Wilson assert a possessory interest in the gun that was found in the area under the hood. Clearly such an area

---

Only moments earlier, however, Sgt. Dailey was asked whether as a Las Vegas police officer he had jurisdiction to issue traffic citations in the separate municipality of North Las Vegas. He responded, "Well, ... it's not a matter of practice for our units to be issuing traffic citations in North Las Vegas."
Transcript of July 14, 1992, p. 110.

**5.** The record does not disclose the length of the response time. Normally such an inquiry takes ten to fifteen minutes.

**6.** On this record the Court is satisfied that Woods had a legitimate possessory interest in the car: it was registered to his mother, and he was the driver.

**7.** A passenger of an automobile which is stopped by the police has a Fourth Amendment interest in remaining free from unreasonable seizure of his or her person. *United States v. Erwin*, 875 F.2d 268, 270 (10th Cir.1989).

is not one in which a mere passenger would ordinarily have a legitimate expectation of privacy, and the two defendants have made no showing that they had such an expectation.

Nevertheless, relying on *United States v. Padilla,* 960 F.2d 854 (9th Cir.1992), Daniel contends that an exception to the *Rakas* rule should be made in his case. In *Padilla* the court held that where the defendants have "demonstrated joint control and supervision over the [contraband] and vehicle and engaged in an active participation in a formalized business arrangement, they have standing to claim a legitimate expectation of privacy in the property searched and the items seized." *Id.* at 860–61. Under the rationale of *Padilla,* Daniel would have standing if on the day of the stop there was a formal arrangement among the defendants to use Woods' car for the purpose of transporting the gun in question, and Daniel had a possessory interest in the gun and a coordinating and supervisory role in the transportation venture. The record before the Court is devoid of evidence to support such a conclusion. Nothing in the record remotely suggests that the defendants had a formalized arrangement about anything, let alone one to use Woods' car to transport a stolen weapon. Moreover, as noted above, Daniel has offered no evidence that he had a possessory interest in the gun. Hence, the *Padilla* claim lacks merit. Neither Daniel nor Wilson have standing to challenge the search of the engine compartment as such.

### 2. The Traffic Stop

██ It is well settled that any police-initiated stop of a moving automobile, including a simple traffic stop, constitutes a limited seizure under the Fourth Amendment and falls within the purview of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Colorado v. Bannis-*

*ter,* 449 U.S. 1, 4 n. 3, 101 S.Ct. 42, 43 n. 3, 66 L.Ed.2d 1 (1980); *Delaware v. Prouse,* 440 U.S. 648, 661–63, 99 S.Ct. 1391, 1400–01, 59 L.Ed.2d 660 (1979).[8] When a police officer effects an automobile stop on the ground that the driver has violated a traffic law, the scope of the resultant detention is strictly limited to the enforcement of that law. *U.S. v. Guzman,* 864 F.2d 1512, 1519 (10th Cir.1988); *U.S. v. Gonzalez,* 763 F.2d 1127, 1130 n. 1 (10th Cir.1985). *Cf. U.S. v. Werking,* 915 F.2d 1404, 1409 (10th Cir.1990). An officer conducting a traffic stop may detain the motorist so long as is necessary to check his driver's license and registration, ask a few perfunctory questions, and write out a ticket. Any expansion of the scope of the stop to include investigation of other suspected illegal activity will only be allowed if the officer has a reasonable, articulable suspicion that other criminal activity is afoot. *See United States v. Pena,* 920 F.2d 1509, 1514 (10th Cir.1990); *United States v. Arango,* 912 F.2d 441, 446–47 (10th Cir.1990); *United States v. Contreras–Dias,* 575 F.2d 740, 744–45 (9th Cir.1978).

It is clear that Woods made an unsafe U-turn. NRS 484.337(4).[9] The government therefore seeks to justify the stop on the ground that it constituted legitimate traffic enforcement. The defendants, however, contend that the stop was purely pretextual and therefore unconstitutional. If the stop was unconstitutional, evidence found as a fruit of the unconstitutional stop may be excluded from evidence, *United States v. Martinez–Fuerte,* 428 U.S. 543, 556, 96 S.Ct. 3074, [3082] 49 L.Ed.2d 1116 (1976); *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); *United States v. Cruz,* 581 F.2d 535 (5 Cir.1978) (en banc)," *United States v. Williams,* 589 F.2d 210, 214 (5th Cir.1979), even if the

---

**8.** Since police usually enforce traffic laws only after witnessing a violation directly, articulable suspicion will almost always exist in the case of traffic stops. *See Prouse,* 440 U.S. at 659, 99 S.Ct. at 1399 ("[t]he foremost method of enforcing traffic and vehicle safety regulations, it must be recalled, is acting upon those violations.")

**9.** NRS 484.337(4) reads as follows:

A U-turn may be made on any road *where such turn can be made with safety,* except as prohibited by this section and by the provisions of NRS 484.309 and 484.339. (Emphasis added.)

defendant lacks standing to challenge the search directly. *United States v. Durant,* 730 F.2d 1180, 1182 (8th Cir.1984).

■ "A pretextual stop occurs when the police use a legal justification to make the stop in order to search a person or place, or. to interrogate a person, for an unrelated serious crime for which they do not have the reasonable suspicion necessary to support a stop." *United States v. Guzman,* 864 F.2d at 1515. The creation of a pretext to justify an arrest or search violates the Fourth Amendment. *United States v. Prim,* 698 F.2d 972, 975 (9th Cir.1983). "Whether an arrest [or detention] is a mere pretext to search turns on the motivation or primary purpose of the arresting [or detaining] officers." *United States v. Smith,* 802 F.2d 1119, 1124 (9th Cir.1986). *See also United States v. Lillard,* 929 F.2d 500, 502 (9th Cir.1991); *Taglavore v. United States,* 291 F.2d 262 (9th Cir.1961).

The testimony of Sgt. Dailey makes it clear that the primary purpose of the SED officers in stopping Woods' car was to search the car and interrogate and search the occupants. The SED officers were engaged in "gang suppression," not traffic control. When the police first observed Woods' car, they immediately recognized Daniel as a gang member, and suspected that the other three men were gang members or associates as well. Moreover, as Dailey admitted, the SED does not ordinarily issue traffic citations in North Las Vegas. Yet it is clear from Dailey's testimony that the officers would have used any traffic infraction, however slight, as an excuse, or in Dailey's words, "pretense," to stop the car. It was purely fortuitous that Woods made an unsafe U-turn just as Dailey was preparing to pull him over.

■ That this was not principally a routine traffic stop is further demonstrated by the officers' conduct immediately following the stop. With no basis in fact to justify a reasonable suspicion that the defendants were engaged in criminal activity, the officers ordered the defendants out of the car at gunpoint, frisked them, and immediately asked whether there were guns or drugs in the car. The Court therefore concludes that the traffic violation was nothing more than a pretext to stop Woods' car and subject the occupants to a search and interrogation for which the officers had neither probable cause nor reasonable suspicion. This was, in short, a roust, which cannot be condoned under the Fourth Amendment.[10]

---

10. Even if the stop had not been pretextual, the officers immediately overstepped the bounds of permissible police conduct during a routine traffic stop. The Court recognizes that a police officer may take reasonable precautionary measures to ensure his or her own safety while effecting a routine traffic stop. *Pennsylvania v. Mimms,* 434 U.S. 106, 111, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977). Such measures, however, do not include ordering the occupants out of the car at gunpoint and patting them down. *See id.* (distinguishing between facts of that case and frisk in *Terry*). Such conduct has only been upheld in the context of an investigative detention, where its constitutionality has hinged on the officer's reasonable and articulable suspicion that the car's occupants were engaged in criminal activity. *See U.S. v. Jones,* 759 F.2d 633, 638–41 (8th Cir.1985); *U.S. v. Jacobs,* 715 F.2d 1343, 1345–46 (9th Cir.1983).

The SED officers testified that the level of force shown in this case is commonly used in routine stops of gang members. Indeed, Officer Kruse characterized this as a "nonhostile" stop. Such an approach to law enforcement is premised on the notion that gang membership alone justifies such extreme precautions. One's status as a gang member, however, even a gang member with a known arrest or conviction record, does not, without more, create the reasonable and articulable suspicion necessary to justify an investigative detention. *See, e.g., U.S. v. Wheeler,* 800 F.2d 100, 105 (7th Cir.1986) (*Terry* stop of known gang member upheld when (1) suspect and other members of gang entered tavern frequented by rival gang, (2) officer observed bulges in the suspect's clothing, (3) several of suspect's companions positioned themselves at tavern door); *State v. Collins,* 479 A.2d 344, 346 (Me.1984) ("an investigative stop cannot be made merely because the person has a criminal record"); *Robinson v. State,* 388 So.2d 286, 290 (Fla.App.1980) ("knowledge of a suspect's previous arrest, standing alone, is insufficient to give rise to a reasonable suspicion"). As LaFave has said, "those with prior arrests and prior convictions must be allowed to live in the world without risk of constant harassment, and thus there is no room for an exception to the rule that a brief seizure for investigation may not be based solely upon an individual's past record." 3 Wayne R. LaFave, Search and Seizure § 9.3(d) at 459 (2d ed. 1987).

Given the current escalation of gang-related violence in the United States, and the public's

### 3. The Consent to Search

 Having concluded that the initial stop of the vehicle and the subsequent detention of the defendants were unlawful, we turn now to the question of the validity of the consent Woods gave for the search of his car. The government, of course, shoulders the burden of demonstrating that consent to a warrantless search is voluntary. *United States v. Ritter*, 752 F.2d 435, 439 (9th Cir.1985).

That a consent to search may be voluntary within the meaning of *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), does not mean that it is free from the taint of a prior illegal detention. *See Brown v. Illinois*, 422 U.S. 590, 603, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975); *Florida v. Royer*, 460 U.S. 491, 507–08, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983). In determining the validity of a consent to search given after illegal law enforcement activity, the court should consider (1) whether the accused was advised that consent need not be given; (2) whether *Miranda* warnings were given prior to the consent; (3) the temporal proximity of the illegal law enforcement activity to the consent; (4) the existence of intervening events; and (5) the purpose and flagrancy of the official misconduct. *See Brown*, 422 U.S. at 603–04, 95 S.Ct. at 2261–62; *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1299–1300 (9th Cir. 1988).

Following the illegal traffic stop Woods was ordered out of his car at gunpoint, frisked, and, in the presence of several officers bearing weapons, asked whether his car could be searched. He was not given *Miranda* warnings, nor was he told he could refuse to consent. The request to search the car immediately followed the frisk. No intervening event dissipated the coercive nature of the illegal detention. Finally, the traffic stop itself was unconstitutionally pretextual. The Court therefore finds that Woods' consent was tainted by the illegal stop and detention. Accordingly, the consent was not valid under the Fourth Amendment.

### RECOMMENDATION

Based on the foregoing, it is the recommendation of the United States Magistrate Judge for the District of Nevada that the Motion to Suppress Evidence (# 361) and the Motion to Suppress Statements and Evidence (Arrest of May 4, 1991) (# 322) should be granted in their entirety.

---

desire to curtail such activity, we may soon see the day when a lower threshold of reasonable suspicion will be acceptable under *Terry* for a brief investigative detention of gang members. *State v. Jones*, 835 P.2d 863 (1992). It is clear, however, that *Terry* and its progeny require *some* degree of particularized suspicion beyond gang membership alone. An individual's membership in a gang may cause a police officer to have an "inchoate and unparticularized suspicion" that the individual's every waking moment is given over to criminal behavior. *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883. However, it would be a perversion of the Fourth Amendment to hold that such a suspicion justifies the interruption of that individual's privacy and liberty during any and all of those waking moments.