REINHARDT, Circuit Judge:
On a December evening in 2003, appellant Lionel Mendez was pulled over by two police officers for failure to display a visible license plate or registration tag. He was asked to exit the vehicle, patted down for weapons and, although there were three small children in the car, told to sit on the curb behind the vehicle while a records check was conducted. In response to questioning about matters unrelated to the purpose of the traffic stop, Mendez ultimately told the officers that there was a gun in the car, at which point they arrested him, searched the car and found the gun. After the district court denied his motion to suppress the evidence, Mendez entered a conditional plea of guilty to being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The only issue on appeal is whether the district court erred when it denied his motion to suppress. We conclude that it did, vacate Mendez’s conviction and remand.
I. FACTUAL AND PROCEDURAL HISTORY[1]
At approximately 9:18 p.m. on December 21, 2003, two Phoenix gang enforcement officers pulled over a car driven by Mendez because they mistakenly thought that it did not have a license plate or temporary registration tag.[2] Both officers testified that the sole purpose of the stop was “no *1165 registration.” The officers, Detectives Jaensson and Bracke, approached the car and saw that there were three small children inside. Det. Jaensson told Mendez why they had stopped him and asked for “his identification or license.” Mendez presented a California identification card. Det. Jaensson then instructed him to get out of the vehicle and interlock his hands behind his head. He proceeded to pat him down for weapons, during which time he noticed a tattoo on his left hand. Mendez complied without incident. The pat-down produced no weapons. Det. Jaensson then instructed Mendez to sit on the curb behind his car. The three small children remained in the vehicle unattended.
Det. Jaensson stayed with Mendez at the curb while Det. Bracke took his identification card to the patrol car to conduct a records check. Det. Jaensson again noticed the tattoo on Mendez’s left hand, recognizing it as a gang-affiliated insignia.[3] Prompted by the gang tattoo, he questioned Mendez, asking, “Where are you from?” According to Det. Jaensson, Mendez responded that he was “from the Latin Kings,” a gang located in Chicago. Det. Jaensson testified that he then continued the questioning, next asking Mendez about his other tattoos. In response to Det. Jaensson’s interrogation, Mendez said at some point ■ that he had left the Latin Kings “in good standing,” and had moved to Arizona “to get away from all that, to turn his life around.”[4]
While a portion, at least, of Det. Jaens-son’s interrogation of Mendez was taking place, Det. Bracke was at the patrol car conducting a records check, using the car’s Mobile Data Terminal (“MDT”).[5] At this time, he noticed in the rear window of Mendez’s vehicle a temporary registration plate that had expired eight days earlier on December 13, 2003.
After completing the records check, which revealed that Mendez had a valid driver’s license and no outstanding warrants, Det. Bracke returned to the curb with the intention of informing him that the temporary registration plate in his rear window had expired. At that time, he overheard Mendez telling Det. Jaensson, in response to the detective’s questioning, that he had come to Arizona “trying to get away from the gang life.”[6] Det. Bracke also overhead him answer that he had spent time in prison in Illinois. Det. Bracke then questioned Mendez as to why *1166 he had been imprisoned.[7] Mendez replied that he had been convicted of a weapons violation. Det. Bracke then asked him if he had any weapons in the car. According to Det. Jaensson and Det. Bracke’s testimony, Mendez became agitated, told them that he was a good father and was trying to make a good life for himself in Arizona, and then said that there was a firearm in the driver’s door handle. At this point, the officers arrested him. Det. Bracke then searched the vehicle and found a loaded, small caliber, semi-automatic pistol in the driver’s side armrest.
Mendez was indicted on charges of violating 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (felon in possession of a firearm).[8] He moved to suppress the handgun, arguing that the officers improperly interrogated him about matters unrelated to the traffic stop and failed to diligently investigate the purpose of the stop. The district court denied the motion, finding that the detectives “identified specific, objective factors sufficient to permit them to expand the scope of questioning” and did not unreasonably prolong the stop. Mendez subsequently entered a conditional guilty plea, preserving his right to appeal the court’s ruling on the suppression motion. The district court sentenced him to fifty-seven months in prison. He appeals.
II. DISCUSSION
Mendez does not contest the legality of the initial traffic stop. Instead, he argues that the officers’ unrelated questioning and extended detention violated his Fourth Amendment rights because (1) the officers did not observe additional particularized, objective factors sufficient to create reasonable suspicion to justify interrogating him about matters beyond the purpose of the stop, and (2) the officers unreasonably prolonged the stop.[9] The government responds that there were specific, objective factors that justified suspicion of criminal activity and the expansion of the scope of the questioning. It does not argue, however, that the questioning was justified by concerns for officer safety.
*1167 A. Propriety of the Investigatory Questioning
The limits of the Fourth Amendment “apply to investigative stops of vehicles such as occurred here.” United States v. Sharpe, 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). The scope of an investigative detention “must be carefully tailored to its underlying justification.” Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). During a traffic stop, a police officer may only “ask questions that are reasonably related in scope to the justification for his initiation of contact.” United States v. Murillo, 255 F.3d 1169, 1174 (9th Cir.2001); see also United States v. Chavez-Valenzuela, 268 F.3d 719, 724 (9th Cir.2001) (“An officer must initially restrict the questions he asks during a stop to those that are reasonably related to the justification for the stop.”). An officer may expand the scope of questioning beyond the initial purpose of the stop only if he “articulate[s] suspicious factors that are particularized and objective.” Murillo, 255 F.3d at 1174; see also Chavez-Valenzuela, 268 F.3d at 724(stating that an officer may expand scope of questioning “only if he notices particularized, objective factors arousing his suspicion” (emphasis added)); United States v. Perez, 37 F.3d 510, 513 (9th Cir.1994) (same).
As the Eleventh Circuit held in another traffic stop case, United States v. Pruitt, 174 F.3d 1215 (11th Cir.1999), it is not necessary that questions be designed to pursue a specific investigatory objective in order for them to violate the Fourth Amendment. There, the court concluded that “additional ‘fishing expedition’ questions such as ‘What do you do for a living?’ and ‘How much money did your van cost?’ are simply irrelevant, and constitute a violation of Terry.” Id. at 1221. We cited Pruitt with approval in Chavez-Valenzuela. See Chavez-Valenzuela, 268 F.3d at 724 n. 4.
In the case before us, the record demonstrates that the officers asked Mendez a number of questions that were unrelated to the purpose of the stop, including questions involving his gang affiliation and the reason for an out-of-state prison sentence a number of years earlier. Det. Jaensson began his questioning by asking Mendez where he was from. Although we doubt that this question was related to the purpose of the stop, we will assume its propriety for purposes of this appeal. Taken literally, the question would probably be permissible, as it would appear to relate to the locality at which the driver’s license or the vehicle registration would have been issued. To that extent, it would be related to the traffic stop.[10] We assume the lawfulness of the question although in context it is best understood as an inquiry in colloquial terms about Mendez’s gang membership — the information it actually elicited— rather than, as might otherwise be thought, a question about the location of his domicile. Indeed, during the suppression hearing, defense counsel asked Det. Jaensson whether “the questions about where he was from ha[d] anything to do with the traffic stop,” to which Det. Jaens-son responded, “No.”
Subsequently, in response to Det. Jaens-son’s continuing interrogation, Mendez told the officers that he had been in prison. *1168 Det. Bracke then questioned him about the reason for his prior incarceration. When Mendez answered that he had been convicted of a weapons offense, more than eight years earlier, Det. Bracke asked him whether there were any weapons in the car. It is the eliciting of this information that led Det. Bracke to ask that final question that is at the center of this appeal.
The government concedes that, in order to question Mendez about matters unrelated to the initial purpose of the stop, the detectives’ questioning had to be justified by additional particularized and objective factors arousing their suspicion. See, e.g., Perez, 37 F.3d at 513. Therefore, Det. Jaensson’s further questioning of Mendez about matters related to his gang affiliation or criminal history would constitute a Fourth Amendment violation unless the officer had lawfully “notice[d] particularized, objective factors arousing his suspicion.” Chavez-Valenzuela, 268 F.3d at 724. Likewise, Det. Bracke’s question about the reason for Mendez’s prior conviction would have to have been based on “particularized, objective factors” not themselves discovered through illegal questioning — factors that are sufficient in themselves to generate reasonable suspicion of criminal activity. Id. at 726.

1. Det. Jaensson’s interrogation regarding Mendez’s gang activities

We begin our analysis of Det. Jaensson’s questioning, then, by determining what information he could properly consider in forming a reasonable suspicion. We assume, as explained earlier, that the officers were made aware lawfully of Mendez’s past or present gang membership. Thus, in order to assess the constitutionality of Det. Jaensson’s continuing interrogation, we first consider whether gang membership, standing alone, justifies a reasonable suspicion of criminal activity.[11] We conclude that it does not, for two reasons.
First, the Supreme Court has made it clear that reasonable suspicion must be based upon “a particularized and objective basis for suspecting the particular person stopped of criminal activity.” United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (emphasis added); see also United States v. Montero-Camargo, 208 F.3d 1122, 1129 (9th Cir.2000) (en banc) (stating that “[t]he requirement of particularized suspicion encompasses ... suspicion that the particular person being stopped has committed or is about to commit a crime”); United States v. Rodriguez-Sanchez, 23 F.3d 1488, 1492(9th Cir.1994) (“Reasonable sus *1169 picion requires that the specific facts and inferences create suspicion that the particular person detained is engaged in criminal activity.” (emphasis added) (internal quotation marks omitted)), overruled in part on other grounds by Montero-Camargo, 208 F.3d at 1134 n. 22. Reasonable suspicion may not be “based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped.” Id. at 1492; see also United States v. Rodriguez, 976 F.2d 592, 596 (9th Cir.1992) (holding that factors relied upon by border patrol agents to justify vehicle stop “describe too many individuals to create a reasonable suspicion that this particular defendant was engaged in criminal activity” (emphasis added)).
Mendez’s former or present gang affiliation may arouse in the mind of the average layperson, as well as of the trained police officer, a generalized or unspecific suspicion that he is associated with criminal types and perhaps has engaged in criminal activity himself. But the fact that an individual is or was a gang member does not by itself generate the sort of particularized and legally relevant suspicion that the Fourth Amendment requires. As one district court has observed, “One’s status as a gang member, ... even a gang member with a known arrest or conviction record, does not, without more, create the reasonable and articulable suspicion necessary to justify an investigative detention.... Terry and its progeny require some degree of particularized suspicion beyond gang membership alone.” United States v. Daniel, 804 F.Supp. 1330, 1335 n. 10 (D.Nev.1992).
Of course, Detectives Jaensson and Bracke were part of the gang enforcement unit,[12] and officers may “draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.” United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (internal quotation marks omitted). However, “[permissible deductions or rational inferences must be grounded in objective facts and be capable of rational explanation.” United States v. Michael R., 90 F.3d 340, 346 (9th Cir.1996). No matter how much “experience and specialized training” the detectives had in gang-related matters, the mere fact of Mendez’s admission regarding gang affiliation does not permit “a rational inference” that he was involved in criminal activity at or about the time of the stop.
Second, an officer’s questioning “must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.” Cortez, 449 U.S. at 417, 101 S.Ct. 690 (emphasis added); see also Brown v. Texas, 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (officers must have “reasonable suspicion, based on objective facts, that the individual is involved in criminal activity”) (emphasis added). Although Mendez’s gang affiliation might arouse suspicion that he was involved in criminal activity at some point in the past and might lead a reasonable officer to suspect that he may become involved in such activity at some point in the future, it does not support a reasonable inference “that criminal activity may be afoot ” at the time of the stop or that Mendez might commit any particular offense now or in the future. Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 *1170 L.Ed.2d 889 (1968) (emphasis added). As we have observed in another context,
Membership in an organization does not reasonably lead to any inference as to the conduct of a member on a given occasion. In other words, the tendency of members of a gang to carry weapons does not lead reasonably to any inference as to whether a gang member was armed on a given occasion.
Spivey v. Rocha, 194 F.3d 971, 978 (9th Cir.1999) (internal quotation marks and citation omitted) (emphasis added).[13] Likewise, Mendez’s affiliation with the Latin Kings does not by itself “reasonably lead to any inference as to[his] conduct” on the night of the stop. Id. As the district court in Daniel observed,
An individual’s membership in a gang may cause a police officer to have an “inchoate and unparticularized suspicion” that the individual’s every waking moment is given to criminal behavior. Terry, 392 U.S. at 27, 88 S.Ct. at 1883. However, it would be a perversion of the Fourth Amendment to hold that such a suspicion justifies the interruption of that individual’s privacy and liberty during any and all of those waking moments.
Daniel, 804 F.Supp. at 1335 n. 10.
Indeed, the fact of Mendez’s gang affiliation generates no more than a generalized “hunch” that he may have committed crimes in the past or that he may be prone to criminal behavior in general, but such hunches fall short of the particularized suspicion that the Fourth Amendment requires. See Chavez-Valenzuela, 268 F.3d at 724(“[A]n inchoate and unparticularized suspicion or hunch cannot withstand scrutiny under the Fourth Amendment.” (internal quotation marks omitted)). The fact that Mendez told the officers that he had come to Arizona “trying to get away from the gang life,” only further demonstrates the extent to which his statement as to his gang affiliation failed to provide any objective indicium of ongoing criminal activity on or about the night in question. We therefore hold that Mendez’s gang membership was not, standing alone, a particularized, objective factor that warranted expanding the scope of questioning beyond the initial purpose of the traffic stop. See id. at 726.
Because Mendez’s gang affiliation was not sufficient to support a reasonable suspicion of criminal activity, Det. Jaensson’s continuing interrogation, including his questions regarding Mendez’s tattoos, gang activities, or criminal history, exceeded the scope of a permissible Terry-traffic-stop interrogation. Accordingly, the information obtained as a result of that questioning may not serve as a lawful basis for the questioning subsequently engaged in by Det. Bracke.

2. Det. Bracke’s questioning of Mendez regarding the reason for his prior prison sentence

The government contends that Det. Bracke was permitted to expand the scope *1171 of questioning beyond that ordinarily permitted in connection with a traffic stop on the basis of a combination of two “particularized, objective” factors: (1) Mendez’s gang affiliation with the Latin Kings, and (2) Mendez’s statement that he had served time in prison.[14] In order to assess this claim, we must determine whether the officers obtained the information regarding these two factors lawfully and, if so, whether the information obtained gives rise to reasonable suspicion of criminal activity.
We have already explained that, questionable or not, we will assume that the information regarding the Latin Kings was lawfully obtained, but that gang membership standing alone is insufficient to give rise to reasonable suspicion of particularized criminal conduct. We have also explained that the information that Mendez had served a prison sentence was obtained unlawfully, during the course of Det. Jaensson’s unwarranted interrogation. The result is, therefore, that in this case the combination of the two factors cannot provide a sufficient lawful basis for Det. Bracke’s questioning of Mendez regarding the nature of his prison sentence. Nor, or course, for the differing reasons we have explained, can either factor standing alone.
We need not rely, however, for our conclusion that Det. Bracke’s questioning was unlawful solely on our determination that the information regarding Mendez’s prison sentence was obtained in violation of the Fourth Amendment. Alternatively, we reject the government’s contention that the fact of Mendez’s former prison sentence and his past or present gang membership, taken together (even if such information were obtained lawfully) created a reasonable suspicion that justified Det. Bracke’s questioning.[15] In considering whether the two factors together could serve to justify Det. Bracke’s expanded questioning of Mendez, “[w]e must consider these factors first separately, and then cumulatively.”[16] Perez, 37 F.3d at 514.
*1172 We have already concluded above that gang membership alone is not sufficient. See supra Part A.l. Similarly, we have previously held in other cases that “a prior criminal history cannot alone establish reasonable suspicion.” Burrell v. McIlroy, 423 F.3d 1121, 1124 n. 3 (9th Cir.2005); see also United States v. Santos, 403 F.3d 1120, 1132 (10th Cir.2005) (“[A] prior criminal history is by itself insufficient to create reasonable suspicion.”); Padilla v. Miller, 143 F.Supp.2d 453, 470 (M.D.Pa.1999) (holding that the facts that a motorist “had a criminal record and was travelling on an interstate highway ... are not sufficient to create an objective basis for extending the scope of the traffic stop to a Terry investigative detention”).
While knowledge of prior criminal activity combined with certain other factors may in some circumstances foster a reasonable suspicion of current criminal activity, and while such knowledge may sometimes be taken into account when an officer considers whether there is a basis for reasonable suspicion, the fact of a prior prison term alone does not suffice. As another circuit has correctly observed,
If the law were otherwise, any person with any sort of criminal record — or even worse, a person with arrests but no convictions — could be subjected to a Terry-type investigative stop by a law enforcement officer at any time without the need for any other justification at all. Any such rule would clearly run counter to the requirement of a reasonable suspicion
United States v. Sandoval, 29 F.3d 537, 543 (10th Cir.1994). In short, to rely on Mendez’s prior prison term as the sole basis for suspecting him of present criminal activity would be to rely on the very sort of “inchoate and unparticularized suspicion or ‘hunch’ ” that the Fourth Amendment forbids.[17] Terry, 392 U.S. at 27, 88 S.Ct. 1868. Accordingly, in the absence of other factors, Mendez’s prior prison term is not a sufficiently “particularized, objective” factor “to justify the extended detention and inquiry into other criminal activity.” Chavez-Valenzuela, 268 F.3d at 724, 726.
The Factors Considered Cumulatively[18]
Having concluded that neither factor, considered individually, would be sufficient to justify Det. Bracke’s questioning (even if the information regarding both had been lawfully obtained), we must now decide whether “taken together they [would] amount to reasonable suspicion.” United States v. Sokolow, 490 U.S. 1, 9, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Although “in some circumstances the sum may amount to more than its parts[,][t]he facts presented in this case ... whether viewed alone or in combination, amount to little.” United States v. Jones, 269 F.3d 919, 929 (8th Cir.2001).
In United States v. Perez, we held that six factors — the defendant’s nervous appearance, avoidance of eye contact, and profuse perspiration, combined with the fact that he was not the vehicle’s registered owner, was heading to a known “drug hub,” and had well-manicured hands *1173 despite claiming to be a mechanic — “[t]aken together, ... amount to reasonable suspicion” sufficient to justify the officer’s broadening his line of questioning. 37 F.3d at 514(quoting Sokolow, 490 U.S. at 9, 109 S.Ct. 1581). Similarly in United States v. Baron, 94 F.3d 1312, 1319 (9th Cir.1996), we held that six factors, “[w]hen considered cumulatively ... justified additional questioning” regarding drug activity during a traffic stop. The six factors identified in Baron were: (1) the vehicle did not belong to the defendant, (2) the defendant could not name the registered owner, (3) the defendant provided inconsistent stories regarding his travel from California to Phoenix, (4) the “inside of the vehicle looked too clean and contained no personal belongings,” (5) there was an “overpowering cherry smell coming from inside the car,” and (6) the defendant appeared nervous. Id.; see also Murillo, 255 F.3d at 1174(holding that five factors — extreme nervousness, lack of eye contact only when asked about drug activity, inability to explain travel plans, elevated heart rate, and evidence of long road trip in a rental car— were sufficient to justify broadening the scope of questioning).
Unlike in Perez, Baron, and Murillo, in which the government cited five or six suspicious factors, all of which involved the defendant’s conduct during the stop, and all of which raised suspicions of a particular form of present criminal activity, drug trafficking, here the government cites only two factors, neither of which involved suspicious conduct on Mendez’s part immediately prior to or during the course of the traffic stop and neither of which suggests current involvement in any particular type of crime.[19] When taken together, the two facts that Mendez is a “former gang member” and a “convicted felon” indicate nothing more than that Mendez had a troubled past. They simply do not provide a particularized, objective basis upon which to infer that Mendez “is, or is about to be, engaged in criminal activity.” Cortez, 449 U.S. at 417, 101 S.Ct. 690.
Many individuals with prior convictions are presently, or were at one time, gang members and vice versa — that is hardly an unusual combination. To hold that the fact that an individual was previously convicted of a crime, and was or is a gang member, is sufficient cause to interrogate him about general criminal activity whenever he may be subjected to a Terry stop would infringe upon the fundamental constitutional rights of many currently law-abiding citizens. Although persons who have committed crimes may be afforded lesser Fourth Amendment rights while on probation or parole, once that process is completed and their debt to society has been fully paid, they are entitled to the same protection against unreasonable searches and seizures as all other individuals.[20]
*1174 We therefore conclude that, considering the two factors together, they do not constitute sufficiently “particularized” and “objective” indicia that give rise to reasonable suspicion that Mendez was engaged in criminal activity at or about the time of the stop. See Chavez-Valenzuela, 268 F.3d at 726. Accordingly, even if the fact that Mendez previously served a prison sentence were to be considered (notwithstanding our conclusion that the officers obtained that information as the result of an unlawful interrogation), Det. Bracke’s additional questioning about matters unrelated to the purpose of the traffic stop exceeded the scope of a permissible Terry-type inquiry and violated the Fourth Amendment. The fruits of that unlawful questioning must be suppressed.
B. Officer Safety
Perhaps recognizing the lack of reasonable suspicion of ongoing criminal activity, the dissent, unlike the government, abandons the district court’s basis for justifying the interrogation and search and proposes an entirely different reason for the intrusion on Mendez’s rights. The district court dismissed the officer safety argument in a footnote, saying that the officer safety concerns did not eliminate the reasonable suspicion requirement, and then deciding that a reasonable suspicion of criminal activity was present. The dissent, however, relies exclusively on officer safety concerns to justify Det. Bracke’s questioning. Its reliance on this new ground is surprising given the paucity of evidence in the record supporting any such concern and, more important, given that the government failed to raise the issue of officer safety on appeal.
The dissent asks us to reach the issue of officer safety because “the court may affirm on any ground fairly supported by the record.” In doing so, it disregards the fact that the government did not present the officer safety issue on appeal. Our authority to affirm the district court on alternative grounds does not excuse the parties from their obligation to brief the issues they wish the court to consider. See, e.g., Scholar v. Pac. Bell, 963 F.2d 264, 266 (9th Cir.1992) (explaining that we ordinarily affirm on alternative grounds only if the issue is briefed by the parties); United States v. Lewis, 787 F.2d 1318, 1323 n. 6 (9th Cir.), as amended on denial ofreh’g and reh’g en banc, 798 F.2d 1250 (9th Cir.1986) (reversing a conviction and declining to reach grounds first raised by the government in its petition for rehearing). If the court reaches an issue not briefed by the concerned party, the opposing party is deprived of the opportunity to respond and the court is deprived of the benefit of briefing. Galvan v. Alaska Dep’t of Corr., 397 F.3d 1198, 1204 (9th Cir.2005). Thus, “generally courts limit themselves to resolving the issues that the parties put before them, as opposed to the issues they spot outside what the parties elect to raise.” Id. at 1204. This is particularly true where the failure was intentional, as opposed to inadvertent. Varney v. Sec’y of Health and Human Servs., 859 F.2d 1396, 1397-98 (9th Cir.1988). Even United States v. Baron, upon which the dissent relies, affirmed on grounds pre *1175 sented on appeal by the prosecution. Baron, 860 F.2d at 913.
A party seeking to raise an issue must include that issue in its brief, setting the issue forth in the briefs “contentions [along with] the reasons ..., with citations to the authorities” and the record. FED. R. APP. P. 28(a)(9)(A), (b). This the government completely fails to do. The brief mentions officer safety only once, in its “Facts” section, where it reports that Mendez was asked to sit on the curb during the stop (leaving three small children alone in his car) because of officer safety. It does not mention the subject again and does not refer even once to officer safety in the “Argument” section of the brief. Nor does it cite to any authority on the officer safety issue. Indisputably, the government did not seek on appeal to justify the questioning or the search on officer safety grounds. As a result of the government’s failure to raise the issue, the defendant did not have the opportunity to respond to the arguments that the dissent now offers on the government’s behalf.
It is likely that the government refrained from raising the officer safety issue on appeal in part, at least, because it believed that officer safety did not justify the questioning here. At oral argument, the government acknowledged that its entire case rose or fell on whether Mendez’s gang membership and prior imprisonment created reasonable suspicion of criminal activity sufficient to justify Det. Bracke’s additional and unrelated questioning.[21] In addition, the government’s unwillingness to raise the issue is not surprising as the circumstances make it plain that the interrogation was not motivated by safety concerns. When the officers took Mendez out of his car and frisked him,[22] they did not seek to discover whether he had any weapons in his car. Instead, they seated him on the curb and interrogated him about his gang membership, tattoos, and other matters. Only later, in the course of conduct *1176 ing the unlawful investigation, did they learn of his prior conviction, several years before, on a weapons charge and on the basis of that information ask him whether he was currently committing a felony— felon in possession of a gun. Thus, the context of the questioning clearly demonstrates its investigatory nature. Given all these circumstances, a judgment on the part of the government not to raise officer safety on appeal would not be unreasonable. Moreover, even though the defendant in his brief referred to the issue briefly, noting that the government might choose to raise officer safety in its answering brief, the government failed to do so. All of these circumstances make it apparent to us that the government’s choice was deliberate.
We note that this is not an instance in which we are justified in deciding an issue not raised by the parties in order to avoid incorrectly interpreting the law. We do not create any incorrect precedent by refraining from reaching the officer safety issue in this case. Nor do we create any intra- or inter-circuit conflict. We simply preserve an issue for another day.
For the above reasons, we decline to consider the officer safety issue on this appeal. We need not decide here whether we could, in our discretion, overlook the government’s decision not to raise the issue before us. Given all of the facts and circumstances we have described above, we simply determine that to the extent such discretion exists, this is not an appropriate ease in which to exercise it.
We fully appreciate the importance of officer safety and agree that officers should have the ability to take necessary steps to protect themselves. For this reason, we note that even were we to reach the question of officer safety on the merits, we would be confronted with a number of questions similar to those that required us to exclude the evidence under Part A., supra.
III. CONCLUSION
We hold that, because the fact of gang membership is not sufficient to generate a particularized, reasonable suspicion of criminal activity, Det. Jaensson was not justified in expanding his questioning of Mendez to topics beyond the scope of the traffic stop. Even if the officers could also have considered that Mendez had once served a prison sentence, this information, either alone or in combination with the information regarding gang membership, does not give rise to the requisite type of particularized suspicion necessary to expand the scope of the interrogation. The dissent suggests that we consider affirming the district court on the alternative ground of officer safety. We decline to do so, as that issue was not raised or briefed before us by the government.
Thus, we conclude that Mendez’s Fourth Amendment rights were violated when he was subjected to interrogation by the officers that exceeded the scope of the traffic stop. Accordingly, the handgun seized from the car must be suppressed as the product of this unlawful questioning. See Wong Sun v. United States, 371 U.S. 471, 487-88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). We therefore reverse the district court’s denial of the motion to suppress, vacate the conviction, and remand for further proceedings consistent with this opinion.
VACATED and REMANDED.

. Our recitation of the facts is based primarily on the testimony adduced at the suppression hearing. Detectives Jaensson and Bracke testified; Mendez did not.

. The dissent describes the area in which Mendez was stopped as a "gang area." However, any such determination "requires careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity.” United States v. Montero-Camargo, 208 F.3d 1122, 1138 (9th Cir.2000) (en banc) (discussing the labeling of an area as "high-crime,” but equally applicable to the "gang area” label). Thus, we have determined that "[d]istrict courts must carefully examine the testimony of police officers in cases such as this,” and have emphasized the importance of being "particularly careful” to ensure that such a characterization "is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business, but is limited to specific, circumscribed locations.” Id. The district court made no such determination before characterizing the area as a gang area. Nor were there grounds to do so. The officers did not describe the neighborhood as such during the suppression hearing or offer any facts to support such a conclusion. That defense counsel accepted the district court's characterization in order to refute the court’s suggestion does not eliminate the necessity of ensuring that such a characterization is properly made. Equally important, the district court did not rely on the characterization to support its finding of reasonable suspicion.

. The tattoo, which displayed a lion wearing a Eve-point crown and the letters "LK,” aroused Det. Jaensson’s suspicion that Mendez was affiliated with a Chicago-based street gang known as the "Latin Kings.”

. The record does not reveal at what point during the questioning Mendez disclosed this information, or the substance of the precise questions asked by Det. Jaensson. Although the district court made no Endings on this point, it is evident from the record that Mendez did not disclose the information regarding the reason for his move to Arizona in response to Det. Jaensson's first question. Det. Bracke heard this response after he completed a records check, almost eight minutes after the initial stop. Regardless of how this information came out in the course of Det. Jaensson's interrogation, there is no relevant factual dispute about what happened with respect to Det. Bracke’s later questions and Mendez’s answers to them.

. The MDT is the computer in the patrol car that the officers use to conduct records checks.

. Det. Bracke also testified that he heard Mendez state that he had been, or was, a member of the Latin Kings. Whether the detectives believed that Mendez was a former or current gang member- — and there is no testimony on this point — is irrelevant to our disposition of this case: our analysis is the same on either set of facts.

.Det. Bracke initially testified that Mendez had "volunteered" that his prison term was for a weapons violation, but shortly thereafter he corrected himself, stating, "I believe I may have, in fact, asked him" why he had spent time in prison. Moments earlier in his testimony, Det. Bracke testified, "I did, in fact, ask [Mendez] something after he informed us that he had spent time in prison in Illinois.” Det. Jaensson similarly testified that “Det. Bracke may have specifically asked a question” regarding Mendez's prison term. By contrast, the written police report, which was filed seven months earlier on January 2, 2004, makes no mention of the fact that Det. Bracke questioned Mendez about his prison term; instead, it merely states that Mendez "told detectives that he had just spent eight years in the Illinois State Department of Corrections for a weapons violation.” At oral argument before this court, the government conceded that Det. Bracke had in fact asked Mendez why he had been imprisoned.

. Section 922(g)(1) prohibits any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year ... [from] possessing] ... any firearm or ammunition." 18 U.S.C. § 922(g)(1). Section 924(a)(2) provides, in relevant part, that anyone who knowingly violates section 922(g) "shall be fined as provided in this title, imprisoned not more than 10 years, or both.” Id. § 924(a)(2).

. Because, as we explain below, we conclude that the interrogation of Mendez was not justified by sufficient "particularized, objective factors,” we do not address his argument that the officers unlawfully prolonged the stop under United States v. Sharpe, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). We also need not consider Mendez’s claim that the officers' questioning violated Arizona law. We do note, however, that Mendez forfeited his state law claim by failing to raise it before the district court in his motion to suppress.

. Cf. Berkemer v. McCarty, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (stating that an "officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer’s suspicions"); Chavez-Valenzuela, 268 F.3d at 724 n. 4 (observing that officer’s “inquiries about Chavez-Valenzuela’s starting point, destination and general travel plans were probably justifiable”).

. We note that, in addition to Mendez’s gang membership, the officers were aware of two other facts: (1) when asked for "his identification or license,” Mendez presented a California identification card and not a driver’s license, and (2) the car he was driving had an expired temporary registration tag. Neither of those facts is, however, relevant to our totality of the circumstances analysis with respect to the additional questioning. The production of the identification card constituted an appropriate response to the officers' specific request. Although the fact that the registration had expired may be pertinent to a registration offense, a recently expired registration does not give rise to reasonable suspicion of involvement in criminal activity, whether considered alone or in combination with gang affiliation. The only Ninth Circuit case the dissent relies on to the contrary involves a boat, not a car, where the driver was unable to name the owner of the boat and had no registration at all. United States v. Thompson, 282 F.3d 673, 678 (9th Cir. 2002). Nor does United States v. Fernandez, 18 F.3d 874 (10th Cir.1994), hold that an expired registration creates reasonable suspicion of criminal activity. That case points to the fact that the driver had proof of a valid registration to support its conclusion that no reasonable suspicion existed.

. Det. Jaensson testified at the suppression hearing that during his eight years working for the Phoenix Police Department's gang enforcement unit, he had “run across numerous individuals from various gangs and several of them from the Latin Kings,” and also “had training in identifying gang tattoos and gang members.”

. Spivey did not involve a Fourth Amendment claim; rather, it concerned whether the trial court properly excluded evidence that two prosecution witnesses were gang members. Id. at 977-78. We held that the exclusion was not error because the fact of gang membership "was not probative to the question of whether [the witnesses] were armed.” Id. at 978.
The dissent, in criticizing our reliance on Spi-vey, appears to argue that the requirement that there be reasonable inferences to support a deprivation of liberty applies only at trial and has no place in the Terry stop analysis. Terry itself, however, explains that reasonableness is the “central inquiry” under the Fourth Amendment and requires that an officer act only on the basis of "specific reasonable inferences which he is entitled to draw.” Terry, 392 U.S. at 19, 27, 88 S.Ct. 1868.

. The government does not seriously contend that Det. Bracke’s questioning was "reasonably related to the justification for the stop.” Chavez-Valenzuela, 268 F.3d at 724.

. The circumstances of the stop provided no additional support for a reasonable suspicion of criminal wrongdoing at the time of Det. Bracke's questioning. When Det. Bracke questioned Mendez about the reason for his prison term, he had already determined that he had a valid driver’s license and that his vehicle registration had expired only eight days earlier. Indeed, Det. Bracke testified that he returned to the curb with the intention of telling Mendez that his registration had expired. At oral argument, the government acknowledged that when Det. Bracke questioned Mendez, he was investigating possible current criminal activity solely on the basis of the two newly discovered facts that Mendez had acknowledged during the course of Det. Jaensson’s interrogation — his gang membership and his earlier prison term.

. Our assessment of each question based on information available at the time it was asked is not contrary to the Supreme Court’s mandate that we look at the totality of the circumstances. United States v. Arvizu, 534 U.S. 266, 274-76, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). Arvizu involved a single decision by the police to stop a vehicle. Id. at 277-78, 122 S.Ct. 744. All of the information used by the Court in the totality inquiry was available at the time of the stop. Id. at 277, 122 S.Ct. 744. This case, in contrast, involves a number of challenged police actions occurring sequentially. In such a situation, the totality of the circumstances inquiry logically applies only to circumstances known at the time of each respective police action. This is clear because whether an officer acted on the basis of a reasonable suspicion cannot be determined using information he discovers subsequently. Moreover, Arvizu's requirement that we consider all the information available at the time of the action was in relation to information that was acquired legally. Id. Arvizu in no way suggests that unlawfully obtained evidence may be used to establish reasonable suspicion.

. Some individuals with prior convictions may be on probation or parole and thus subject to special searches or restraints without reasonable suspicion. Such persons' Fourth Amendment rights may be limited. See Samson v. California, - U.S. -, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006). The same is not true for persons who have served their time and fully paid their debt to society.

. In light of this section, it is unclear why the dissent argues that we fail to consider the factors cumulatively.

. As explained above, see supra, note 16, in this case the circumstances justifying the stop are not probative of criminal activity and, thus, the government does not rely on such factors. Moreover, during the stop, Mendez was forthcoming in his answers to the officers' questions, lawful and unlawful, and exhibited no signs of nervousness until after he was asked the final question, whether he had any weapons in the car. That question, we hold, was unlawful because it was the product of, as well as a part of, an unlawful interrogation exceeding the scope of the Terry stop. Thus, the government properly does not rely on Mendez's conduct during the course of the stop to justify the expanded interrogation.

. Our holding is entirely consistent with our decision in Michael R., 90 F.3d 340, in which we upheld an investigatory stop of a vehicle. In that case, we found that the fact that young men in the car "had haircuts that were characteristic of gang members has evidentiary significance under the totality of the circumstances analysis.” Id. at 346. We have held that gang membership may be a factor when *1174 other circumstances that are themselves inherently suspicious exist. In Michael R., officers based their investigatory stop on five other factors in addition to the gang-style haircuts. Id. There, we determined that the ''clincher” was the fact that, prior to being pulled over, the young men had engaged in a "street game of cat and mouse” that caused the plainclothes officer who was driving an unmarked car to fear that he was in physical danger. Id. at 346-47. By contrast, here, Mendez does not question the stop and, con-cededly, engaged in no suspicious or threatening behavior.

. The discussion at oral argument included the following:
The Court: So why was it necessary, what was the totality of the circumstances that justified the further questioning about why were you in prison and do you have a gun in the car?
The Government: Well that came about first from asking him, “Where are you from?” and instead of saying “I am from Chicago or I am from Los Angeles,” "I’m from the Latin Kings” which is a suspicious answer in itself. They followed up on that question or he actually followed up and volunteered not only am I from the Latin Kings but I've spent time in prison.... So investigating that further line of questioning, based on that new reasonable suspicion. ...
This exchange was shortly followed by:
The Court: Your position is that the issue in the case is if a man has gang symbols on and he’s been in prison, that gives you particularized suspicion?
The Government: Yes, that’s what the district court found, that the fact' — yes, yes, that that is, that is the position, yes your Honor, yes.
The Court: And if we decided that was not, those facts did not give rise to particularized suspicion, you would lose?
The Government: I believe so. Yes. Although it is true, as the dissent notes, that, in response to a suggestion originating with our dissenting colleague, government counsel made a brief allusion to officer safety during the oral argument, the reference is far from sufficient to resurrect the issue that it abandoned in its briefs, especially given its reiteration of the issue that it acknowledged was before the court.

. Mendez does not challenge this frisk, so we do not consider whether it could be justified by officer safety concerns. We note, however, that his failure to challenge the frisk does not, as the dissent argues, amount to a concession that the frisk is justified by officer safety concerns. Rather, it is most likely due to the fact that nothing was found in the frisk and, as a result, there is no need for Mendez to argue that the fruits of the frisk should be suppressed.